WO

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America,<br><br>                Plaintiff,<br><br>v.<br><br>Donald Hugh Nichols,<br><br>                Defendant. | No. CR-18-01684-TUC-CKJ (BGM)<br><br>**REPORT AND RECOMMENDATION** |

Currently pending before the Court is Defendant Donald Hugh Nichols's Motion to Dismiss Count 10 for Lack of Federal Jurisdiction (Doc. 70), Motion to Dismiss Count 10 – Void for Vagueness (Doc. 71), and Motion to Dismiss Count 10 of the Indictment for Failure to State and Offense (Doc. 72).  The Government has filed its responses (Docs. 79, 80, 81) and Defendant replied (Docs. 86, 87, 89).  Defendant Donald Hugh Nichol's is charged with seven (7) counts of wire fraud; one (1) count of theft of livestock; and one (1) count of retaliating against a witness, victim, or an informant.  Superseding Indictment (Doc. 21).

Pursuant to LRCrim. 5.1, this matter came before Magistrate Judge Macdonald for oral argument and a report and recommendation.  The Magistrate Judge recommends that the District Court, after its independent review, deny Defendant's motions.

## I.  FACTUAL BACKGROUND

Clay Matthew ("Buck") Parsons works at Marana Stockyards, his family's

business. Hr'g Tr. 2/7/2020 (Doc. 99) at 32:16–33:11. Mr. Parsons has been employed by Marana Stockyards since 2013. *Id.* at 33:6–15. Marana Stockyards is a livestock auction that markets cattle for sellers and is a location for buyers to purchase cattle. *Id.* at 33:25–34:3. The cattle sold at Marana Stockyards come from all over Arizona, as well as neighboring states, and occasionally more distant states and Mexico. *Id.* at 34:4–9, 35:6–8. Mr. Parsons's responsibilities at the stockyard include assisting in the management of the day-to-day business; managing fellow employees; sorting, loading, and unloading cattle; working with accounts receivable; and working with collecting money and custodial accounts. *Id.* at 33:16–24, 41:22–24.

Mr. Parsons described the auction process and indicated that cattle typically arrive at the auction house beginning a couple of days prior to the auction through to the day of auction. Hr'g Tr. 2/7/2020 (Doc. 99) at 34:10–13. Auctions take place on Wednesday, with cattle beginning to arrive as early as the weekend prior. *Id.* at 34:14–20, 41:25–42:5. Mr. Parsons testified that generally the seller brings the cattle, or if it is a large enough ranch or consigner, the cattle will be shipped to the stockyard. *Id.* at 34:21–35:1, 42:15–25. Mr. Parsons further testified that once the rancher arrives at the stockyard, the cattle are unloaded, inspected, tagged, and paperwork is reviewed. *Id.* at 35:9–20, 43:17–24. Marana Stockyards stores and cares for cattle until the Wednesday auction, but it does not hold title at this time. *Id.* at 43:1–16. Mr. Parsons described the actual auction as a live auction where cattle are brought in, weighed, and viewed by sellers and buyers who are in the stands. Hr'g Tr. 2/7/2020 (Doc. 99) at 35:21–36:3, 59:2–17. Mr. Parsons explained that in-person buyers live bid on the cattle, and the auction is also live-streamed so that approved buyers can bid online from wherever they are and sellers can watch, as well. *Id.* at 36:6–23, 59:2–60:5. Mr. Parsons also noted that potential buyers can also bid via telephone. *Id.* at 36:24–37:1. Mr. Parsons indicated that a large majority of Marana Stockyards' sales are to brokers buying cattle for people out of state. *Id.* at 53:1–14. Mr. Parsons observed that in terms of volume, non-broker purchasers represent a minority of the overall total head of cattle sold. *Id*. at 53:15–54:1.

After a buyer has won the bid, that individual will go into the office, Marana Stockyards will collect payment and exchange paperwork, and then the stockyard will load the buyer's cattle. Hr'g Tr. 2/7/2020 (Doc. 99) at 37:2–16. For online buyers or brokers who are not physically present, the cattle are moved to the individual's or entity's name; the buyer/broker will inform Marana Stockyards when the cattle are leaving, who is hauling them, how they are getting there, and how payment will be made; and Marana Stockyards will send invoices and await payment. *Id.* The stockyard only takes cash or checks for in-person payment, otherwise payment is received through wire transfer. *Id.* at 37:17–38:7. Once a buyer has paid for their cattle, it is loaded onto trucks or other transport and sent to their destination. *Id.* at 38:8–14. Mr. Parsons further explained that the seller is paid immediately irrespective of how long it takes the buyer to remit payment. Hr'g Tr. 2/7/2020 (Doc. 99) at 40:19–41:8. Marana Stockyards has a custodial account in which it deposits money from a credit line, and when an animal is sold, the stockyard immediately writes a check to the seller and provides it to them in person, if they are present, or via mail. *Id.* at 40:19–41:8, 54:19–55:2, 55:23–56:22, 57:20–58:7. As a result, if a buyer fails to pay, Marana Stockyards retains ownership of the cattle. *Id.* at 44:6–11, 57:20–59:1.

Mr. Parsons testified that the Wednesday prior to the hearing an auction was held at Marana Stockyards. *Id.* at 38:15–16. Mr. Parsons further testified almost 1,100 head of cattle were sold. *Id.* at 38:17–18. Mr. Parsons also testified that by the time of the hearing, two (2) days later, that there were approximately 100 head of cattle remaining at the stockyard. *Id.* at 38:19–22. Mr. Parsons indicated that the majority of the thousand cattle that were transported were taken out of state to Texas, as well as California and New Mexico. Hr'g Tr. 2/7/2020 (Doc. 99) at 38:23–39:2, 44:12–17. Mr. Parsons noted that Arizona does not have many places to feed cattle, nor are there many slaughterhouses. *Id.* at 62:3–63:3. Mr. Parsons explained that occasionally a purchaser would buy more cattle than could be loaded on a single truck. *Id.* at 50:13–20. In such cases, a buyer might have to arrange for multiple trucks or for smaller numbers of

overflow, buyers might arrange with Marana Stockyards to hold the extra head over. *Id.* at 50:21–51:12. When cattle are held over, buyers are responsible to Marana Stockyards for the cost of feed. *Id.* at 51:13–16. Mr. Parsons testified that it would be unusual for buyers to put the cattle back up for sale. Hr'g Tr. 2/7/2020 (Doc. 99) at 51:19–52:6.

Mr. Parsons noted that on the Thursday or Friday following each sale, Marana Stockyards prepared a market report. *Id.* at 39:3–5. Mr. Parsons described the market report as a tool that provides an overview of the different classifications and weights of cattle to provide an overview of what was brought that day. *Id.* at 39:6–10. Mr. Parsons explained that sellers, buyers, other auction barns utilize Marana Stockyards' market report. *Id.* at 39:11–23. Mr. Parsons further explained that sellers use the market report to compare how their cattle sold compared to the market as a whole; buyers use it to see if the cattle they purchased were within the range or if they want to buy from Marana; and other auction barns compare their market to Marana Stockyards' market on that day. *Id.* Additionally, the market report is one way that Marana Stockyards advertises to buyers and sellers, it is mailed, both electronically and via post, as well as posted on the company's website. Hr'g Tr. 2/7/2020 (Doc. 99) at 40:2–11. Mr. Parsons reported that Marana Stockyards also advertises via Facebook, word of mouth, and telephone. *Id.*

Mr. Parsons testified that he knew Defendant Hugh Nichols and indicated that he was a bonded buyer at the stockyard. *Id.* at 45:5–19, 49:17–23. Mr. Parsons described a bonded buyer as someone who is hired to buy cattle and has a bond protecting them in the event that the actual buyer does not pay. *Id.* at 60:22–61:7.   Mr. Parsons further testified that Mr. Nichols would frequently attend auctions and buy cattle for himself and other people out of state. *Id.* at 45:10–25, 46:20–47:10. Mr. Parsons also testified that although he did not know the exact proportion of cattle that Mr. Nichols purchased to go out of state versus those that he purchased for in state, Mr. Parsons believed that the majority went out of state because he would load them on trucks headed to out-of-state destinations. Hr'g Tr. 2/7/2020 (Doc. 99) at 46:1–19. Mr. Parsons testified that he did not know whether Mr. Nichols owned a ranch. *Id.* at 61:8–11. Mr. Parsons further

testified that at some point he investigated who owed money on the Marana Stockyards accounts receivable account and determined that ninety (90) percent of the money owed was owed by Defendant's businesses—Nichols Cattle Company and Nichols Management. *Id.* at 63:3–25.

Count 10 of the Superseding Indictment (Doc. 21) charges Defendant Nichols with theft of livestock in violation of Section 667, Title 18, United States Code, and states:

> From on or about August 2013, and continuing through on or about August 2017, in the District of Arizona and elsewhere, the defendant, DONALD HUGH NICHOLS, knowingly obtained and used the property of another, to wit: cattle valued at $1,649,585, which has a value of $10,000 or more in connection with the marketing of such livestock in interstate or foreign commerce with the intent to deprive the true owner of the right to the property, a benefit of the property, and to appropriate the property to the defendants' own use or the use of another,, all in violation of Title 18, U.S.C. § 667, Theft of Livestock.

Superseding Indictment (Doc. 21) at ¶ 27.[1]

## II. ANALYSIS

### A. Count 10 — Failure to State an Offense

Mr. Nichols asserts that Marana Stockyards "holds and/or administers the funds between buyer and seller using the trust account required under the [Packers and Stockyard Act ("PSA"), 7 U.S.C. § 196], [and] therefore, MSY does not acquire title to the livestock but only stands in the position of a fiduciary." Def.'s Mot. to Dismiss Count 10 of the Indict. for Failure to State an Offense (Doc. 72) at 3. Because Mr. Nichols was both the buyer and the seller of his cattle, he asserts that he "never relinquished title to his cattle under theses circumstances and did not violate 18 U.S.C. § 667." Def.'s Mot. to Dismiss Count 10 of the Indict. for Failure to State an Offense (Doc. 72) at 3; *see also* Def.'s Reply re Failure to State an Offense (Doc. 86) at 2.

---

[1] This recitation reflects the stipulated removal of Defendant's wife from the Superseding Indictment which occurred during the hearing. *See* Hr'g Tr. 2/20/2020 (Doc. 99) 7:1–9.

- 5 -

Defendant Nichols further urges that "[t]he PSA has provisions for the recuperation of unpaid accounts for market agencies[,]" which would have been the appropriate recourse for Marana Stockyards "for any claims of unpaid trust accounts[.]" *Id.* at 4. The Government asserts that Marana Stockyards "uses a line of credit to immediately pay sellers on the same day as the sellers sell their cattle at the auction." Govt.'s Response re Failure to State an Offense (Doc. 81) at 2. The Government explains that as such, "once MSY pays the seller, the cattle becomes the property of MSY until the buyer pays MSY." *Id.*

> Section 667, Title 18, United States Code provides:
>
> Whoever obtains or uses the property of another which has a value of $10,000 or more in connection with the marketing of livestock in interstate or foreign commerce with intent to deprive the other of a right to the property or a benefit of the property or to appropriate the property to his own use or the use of another shall be fined under this title or imprisoned not more than five years, or both. The term "livestock" has the meaning set forth in section 2311 of this title.

18 U.S.C. § 667. "'Livestock' means any domestic animals raised for home use, consumption, or profit, such as horses, pigs, llamas, goats, fowl, sheep, buffalo, and cattle, or the carcasses thereof[.]" 18 U.S.C. § 2311. Marana Stockyards is a "sale barn" regulated by the PSA. Govt.'s Response re Failure to State an Offense (Doc. 81) at 2; Def.'s Reply re Failure to State an Offense (Doc. 86) at 3.

Here, Mr. Parsons explained that the seller is paid immediately irrespective of how long it takes the buyer to remit payment. Hr'g Tr. 2/7/2020 at 40:19–41:8. Marana Stockyards has a custodial account in which it deposits money from a credit line, and when an animal is sold, the stockyard immediately writes a check to the seller and provides it to them in person, if they are present, or via mail. *Id.* at 40:19–41:8, 54:19–55:2, 55:23–56:22, 57:20–58:7. As a result, if a buyer fails to pay, Marana Stockyards retains ownership of the cattle. *Id.* at 44:6–11, 57:20–59:1. Mr. Parsons testified that the paperwork that accompanies a sale includes invoices and brand papers which contain the buyer's name and information, as well as the animal's information. *Id.* at 58:18–59:1.

Mr. Parsons further testified that this paperwork also states that Marana Stockyards retains ownership until the cow is paid for. *Id.* The Court finds Mr. Parson's testimony credible. As such, the Court further finds Defendant's assertion that "MSY had no ownership or title to the cattle, and therefore, clearly could not have been the victim under 18 U.S.C. § 667" is without merit. The Court recommends denial of Defendant's motion to dismiss for failure to state an offense.

### B. Count 10 — Lack of Jurisdiction

Mr. Nichols asserts that "assuming *arguendo* that the Court accepts that the term 'marketing' encompasses the sale of livestock at a sale barn, and that the Marana Stockyard is the correctly defined victim, the offense conduct at issue is purely intrastate." Def.'s Mot. to Dismiss Count 10 for Lack of Fed. Juris. (Doc. 70) at 5. Mr. Nichols further asserts that "[i]f interstate transport of the cattle occurred, it necessarily must have occurred after the sale at auction of the cattle, necessarily after the act constituting the deprivation of property occurred." *Id.* Mr. Nichols also urges that the language of Section 667, Title 18, United States Code, is "more limited in scope, reflecting an intent by Congress not to extend its commerce power to reach fully intrastate conduct[,]" requiring dismissal of Count 10 for lack of federal jurisdiction. Def.'s Mot. to Dismiss Count 10 for Lack of Fed. Juris. (Doc. 70) at 3. The Government argues that the statute at issue is broader than the authority relied on by Defendant. Govt.'s Response re Lack of Fed. Juris. (Doc. 80) at 4. The Government further asserts that the allegation of activity by Defendant "in Arizona and elsewhere" is sufficient for jurisdictional purposes. *Id.* at 5.

As an initial matter, "[t]he district courts of the United States shall have original jurisdiction, exclusive of the courts of the States, of all offenses against the laws of the United States." 18 U.S.C. § 3231. Furthermore, it is well established law that "[a]n indictment returned by a legally constituted and unbiased grand jury, like an information drawn by the prosecutor, if valid on its face, is enough to call for trial of the charge on the merits." *Costello v. United States*, 350 U.S. 359, 363, 76 S. Ct. 406, 409, 100 L. Ed. 397

(1956). "[A] defendant may not properly challenge an indictment, sufficient on its face, on the ground that the allegations are not supported by adequate evidence." *United States v. Jensen*, 93 F.3d 667, 669 (9th Cir. 1996) (quotations and citations omitted). The Supreme Court of the United States has said "that there are three categories of activity that Congress may regulate under its commerce power: (1) the use of the channels of interstate commerce; (2) the instrumentalities of interstate commerce, or persons or things in interstate commerce, even though the threat may come only from intrastate activities; and (3) those activities having a substantial relation to interstate commerce, . . . *i.e.*, those activities that substantially affect interstate commerce." *Taylor v. United States*, — U.S. —, 136 S. Ct. 2074, 2079, 195 L. Ed. 2d 456 (2016) (quotations and citations omitted) (alterations in original). "[T]he starting point in every case involving construction of a statute is the language itself." *Watt v. Alaska*, 451 U.S. 259, 265, 101 S. Ct. 1673, 1677, 68 L. Ed. 2d 80 (1981) (citations omitted).

Here, the theft of livestock statute proscribes obtaining or using "the property of another which has a value of $10,000 or more in connection with the marketing of livestock in interstate or foreign commerce with intent to deprive the other of a right to the property or a benefit of the property or to appropriate the property to his own use or the use of another[.]" 18 U.S.C. § 667. "Marketing" is defined as "the act or process of selling or purchasing in a market[.]" Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/ (last visited June 26, 2020). "In connection with" is an idiom meaning "in relation to" or "for reasons that relate to." *Id.* Defendant likens the scope of the statute at issue to that of a pre-2007 child pornography statute which "punishe[d] any person who knowingly mail[ed], or transport[ed] or ship[ped] in interstate or foreign commerce by any means, including by computer, any child pornography." *United States v. Wright*, 625 F.3d 583, 591 (9th Cir. 2010). Defendant urges that the theft of livestock statute represents a narrow exercise of Congress's commerce power. Def.'s Mot. to Dismiss re Lack of Jurisdiction (Doc. 70) at 3. Defendant further argues that the Government's failure "to distinguish which

- 8 -

transactions properly arose out of interstate transactions and which were solely intrastate" divests this Court of jurisdiction over Count 10. Def.'s Reply re Lack of Jurisdiction (Doc. 89) at 2–3. Defendant asserts that the Theft of Livestock statutes falls within the second category of commerce regulation "involving persons or things in interstate commerce." *Id.* at 3.

The text of the theft of livestock statute does not support the narrow construction put forth by Defendant. The statute in *Wright* proscribed the specific and identifiable acts of mailing, transporting, or shipping in interstate commerce. *Wright*, 625 F.3d at 591. The theft of livestock statute punishes obtaining or using the property of another "in connection with the marketing of livestock in interstate or foreign commerce[,]" which means in relation to the act or process of selling or purchasing in a market. The allegation of Count 10 refers to Defendant's conduct that occurred "in the District of Arizona and elsewhere." Moreover, Defendant's argument places the statute within the second category of commerce clause regulation, "the instrumentalities of interstate commerce, or persons or things in interstate commerce," but ignores that the Supreme Court has contemplated that "the threat may come only from intrastate activities[.]" *Taylor*, — U.S. —, 136 S. Ct. at 2079. The Court finds that the plain language of Section 667, Title 18, United States Code, supports federal jurisdiction of the charge alleged in Count 10 of the Superseding Indictment and recommends Defendant's motion to dismiss be denied.

### C. Count 10 — Void for Vagueness

Mr. Nichols asserts that "the language [of the Theft of Livestock statute] is too vague as to properly define a crime." Def.'s Mot. to Dismiss Count 10 — Void for Vagueness (Doc. 71) at 2. Mr. Nichols argues that the statute violates Due Process because "it fails to give reasonable warning as to what conduct is proscribed and what conduct is not." *Id.* at 4.

"To satisfy due process, a penal statute [must] define the criminal offense [1] with sufficient definiteness that ordinary people can understand what conduct is prohibited and

- 9 -

[2] in a manner that does not encourage arbitrary and discriminatory enforcement." *Skilling v. United States,* 561 U.S. 358, 403, 130 S. Ct. 2896, 2928, 177 L. Ed. 2d 619 (2010) (quotations and citations omitted) (alterations in original). "In interpreting a statute, [a court] must examine its language[;] [i]f the statute is clear and unambiguous, that is the end of the matter." *United States v. Chhun*, 744 F.3d 1110, 1116 (9th Cir. 2015).

Here, Defendant argues that the term "marketing" is unclear. Def.'s Mot. to Dismiss Count 10 — Void for Vagueness (Doc. 71) at 3–5. As discussed in Section II.B., *supra*, "marketing" is defined as "the act or process of selling or purchasing in a market[.]" Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/ (last visited June 26, 2020). The theft of livestock statute proscribes obtaining or using "the property of another which has a value of $10,000 or more in connection with the marketing of livestock in interstate or foreign commerce with intent to deprive the other of a right to the property or a benefit of the property or to appropriate the property to his own use or the use of another[.]" 18 U.S.C. § 667. As such, an individual is prohibited from 1) obtaining or using; 2) the property of another which has a value of $10,000 or more; 3) in connection with the marketing (the act or process of selling or purchasing in a market) of livestock in interstate or foreign commerce; 4) with intent to deprive the other of a right to the property or a benefit of the property or to appropriate the property to his own use or the use of another. The Court finds the statute's language is clear and unambiguous and recommends that Defendant's motion be denied.

### III. CONCLUSION

The Court finds that dismissal of Count 10 of the indictment is unwarranted.

### IV. RECOMMENDATION

For the foregoing reasons, the Magistrate Judge recommends that the District Court DENY Defendant Donald Hugh Nichols's Motion to Dismiss Count 10 for Lack of

Federal Jurisdiction (Doc. 70), Motion to Dismiss Count 10 – Void for Vagueness (Doc. 71), and Motion to Dismiss Count 10 of the Indictment for Failure to State and Offense (Doc. 72).

Pursuant to 28 U.S.C. §636(b) and Rule 59(b)(2) of the Federal Rules of Criminal Procedure, any party may serve and file written objections within fourteen (14) days after being served with a copy of this Report and Recommendation. No reply shall be filed unless leave is granted from the District Court. If objections are filed, the parties should use the following case number: **CR-18-01684-TUC-CKJ**.

Failure to file timely objections to any factual or legal determination of the Magistrate Judge in accordance with Fed. R. Crim. P. 59 may result in waiver of the right of review.

Dated this 2nd day of July, 2020.

Honorable Bruce G. Macdonald
United States Magistrate Judge